[No. C017925. Third Dist. Jan. 26, 1995.]

STEVEN GERVASE et al., Petitioners, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
PRUDENTIAL SECURITIES, INC., et al., Real Parties in Interest.

**COUNSEL**

Archibald M. Mull III and Allan S. Haley for Petitioners.

No appearance for Respondent.

Steefel, Levitt & Weiss, Michael J. Lawson, Michael D. Early and Bruce C. Judge for Real Parties in Interest.

---

## OPINION

**SPARKS, Acting P. J.**—The petitioners are plaintiffs in an action pending in the superior court based generally upon alleged fraud in the sale of securities.[1] After several attempts at pleading the trial court sustained, without leave to amend, the defendants' demurrer to plaintiffs' federal Racketeer Influenced and Corrupt Organizations Act (RICO) cause of action. (18 U.S.C. § 1961 et seq.) We issued an alternative writ of mandate in order to determine whether plaintiffs have sufficiently alleged a RICO cause of action in their third amended complaint. We conclude that they have and shall issue a peremptory writ of mandate directing the superior court to overrule the demurrer as to that cause of action.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

■ The question raised by a demurrer to the complaint is simply whether it alleges sufficient facts to state a cause of action. (*Johnson* v. *Clark* (1936) 7 Cal.2d 529, 536 [61 P.2d 767]; *Brousseau* v. *Jarrett* (1977) 73 Cal.App.3d 864, 870-871 [141 Cal.Rptr. 200].) A demurrer is not concerned with the likelihood that the plaintiffs will prevail, nor even whether they have evidence to support their allegations. (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]; *Accardi* v. *Superior Court* (1993) 17 Cal.App.4th 341, 346 [21 Cal.Rptr.2d 292].) Instead, a demurrer admits, provisionally for purposes of testing the pleading, all material facts properly pleaded, however improbable they may be. (*Potter* v. *Arizona So. Coach Lines, Inc.* (1988) 202 Cal.App.3d 126, 130-131 [248 Cal.Rptr. 284]; *McHugh* v. *Howard* (1958) 165 Cal.App.2d 169, 174 [331 P.2d 674].) Accordingly, we will draw our recitation of the facts, which we accept as true for purposes of this proceeding, from plaintiffs' third amended complaint.[3]

---

[1]For convenience and clarity we will hereafter refer to the parties by their designations in the trial court, that is, as plaintiffs and defendants.

[2]The trial court also sustained without leave to amend the defendants' demurrer to a cause of action purporting to allege the intentional infliction of emotional distress. Plaintiffs have not sought extraordinary relief with respect to that cause of action and we do not consider it.

[3]Plaintiffs have requested that this court take judicial notice of certain records from the criminal proceedings in United States of America v. Prudential Securities Incorporated, No. 94 MAG 2189, currently pending in the United States District Court for the Southern District of New York. These records relate to proceedings which occurred subsequent to the ruling on

The plaintiffs are individuals and related entities who are primarily concerned with the business of poultry ranching.[4] Defendant Prudential Securities, Inc. (hereafter PSI), is a corporation engaged in the securities brokerage business.[5] Defendant Michael Baker was a registered representative employed by PSI as assistant manager and then manager of the PSI Stockton branch.

During the period from 1984 to 1988, the plaintiffs were customers of PSI at its Stockton branch. Plaintiffs' accounts were managed and controlled by Charles Smith, who at that time was a registered securities representative employed by PSI. Smith had been plaintiff Agnes Gervase's broker for a number of years prior to 1984. Between 1984 and 1988, PSI, through Smith and with the approval and supervision of defendant Baker, sold plaintiffs numerous interests in limited partnerships at a cumulative cost exceeding $532,190. The limited partnership interests were highly speculative and risky investments, suited only to sophisticated investors with surplus wealth. These interests have ceased to be worth the sums plaintiffs paid for them. As a result of these investments plaintiffs lost their investment capital.

Plaintiffs further allege that they invested in the limited partnership interests as a result of inducements by PSI and its representatives that sound in fraud and misrepresentation. Plaintiffs assert that they are comparatively unsophisticated investors with relatively modest investment capital. Their investment objectives, communicated to defendants, were to invest in securities that were safe, did not involve significant risk, and that would be dependable income-producing and principal-preserving investments. Plaintiffs allege that with respect to each limited partnership interest they purchased the defendants falsely represented that the investment was well-suited to their investment objectives, involved little or no risk, and had long-term potential for excellent appreciation. Plaintiffs did not discover the

demurrer at issue here and thus were not available when the trial court made its ruling. Since we shall conclude that plaintiffs' third amended complaint sufficiently alleges a RICO cause of action, reference to these subsequent criminal proceedings is unnecessary and the request for judicial notice is denied.

[4]The individual plaintiffs are Steven and Frances Gervase, who are husband and wife, and Agnes Gervase, who is Steven's mother. Steven and Agnes are partners in plaintiff Gervase Farms, a general partnership. The other plaintiffs are financial investment plans created by the individual plaintiffs, including the Gervase Individual Retirement Accounts and Keough Pension Plans, and the Gervase Farms Profit Sharing Plan dated December 30, 1985. The defendants are Prudential Securities, Inc., Michael Baker, and Does 1-100.

[5]Plaintiffs allege that PSI is a wholly owned subsidiary of the Prudential Insurance Company of America. They assert that in 1981 the Prudential Insurance Company acquired a securities brokerage firm known as the Bache Group, which was then operated as a wholly owned subsidiary known as Prudential-Bache Securities, Inc., and which ultimately became PSI.

falsity of these representations until much later, in part due to continuous reassurances by PSI, and in part because PSI sent monthly account statements falsely reflecting that the investments continued to be worth their cost.

That is the gist of plaintiffs' complaint; fleshing it out becomes rather complicated. Plaintiffs allege that during the relevant period there was within the broad Prudential conglomeration a business unit known as the Direct Investment Group (the DIG) headed by one James Darr. The limited partnership interests purchased by the plaintiffs were designed and packaged by the DIG for sale through PSI. Despite the speculative and risky nature of the limited partnerships, PSI purposely marketed the interests to investors for whom they were ill-suited, such as the plaintiffs.

In order to induce brokers to favor the sale of limited partnership offerings over other forms of investment, PSI and the DIG structured the offerings so that brokers would receive commissions from the sale of limited partnerships that were up to eight times greater than the commissions that would be received from the sale of a comparable dollar amount of stocks, bonds, or mutual funds. In addition, PSI promised to pay "residuals" to brokers who sold at least $25,000 worth of any particular partnership and remained with PSI. These residuals were to represent half of the net earnings of Prudential affiliates as general or special limited partners in connection with the offering. Fact sheets distributed by PSI and the DIG on limited partnership offerings would estimate the value of residuals that could be earned for each unit sold. PSI provided periodic reports to brokers estimating the amount of residuals they could expect from sales made. And PSI awarded fully paid trips and vacations to high-producing brokers.

The various limited partnership offerings were accompanied by prospectuses containing thousands of pages of dense and complicated legalese. Brokers were told to disregard the prospectuses and rely upon fact sheets prepared by the DIG. The fact sheets failed to disclose the speculative and risky nature of the investments and were intended to keep customers ignorant of those risks. In addition, the DIG prepared, and PSI distributed to brokers, certain "scripts" setting forth a sales approach to be used by brokers in selling limited partnership offerings to modest investors, like plaintiffs, for whom the investments were ill-suited. These scripts contained the misleading and false representations that were made to plaintiffs in inducing them to purchase limited partnership interests.

In all the plaintiffs purchased at least 39 limited partnership interests. For purposes of setting forth the representations used to induce them to make the purchases, the plaintiffs divided their purchases into two broad categories

which they delineate (1) the real estate, aircraft leasing and film limited partnerships, and (2) the energy income and energy growth fund limited partnerships. They allege that with respect to each type of purchase Smith made certain uniform representations pursuant to the scripts prepared by the DIG and supplied by PSI.

With respect to each of the real estate, aircraft leasing and film limited partnerships, plaintiffs allege that Smith, pursuant to the script, made the following false representations to them: the investment was suited to their investment objectives; the investment was low risk with long-term potential for excellent appreciation while producing a tax-advantaged cash flow; the investment had been fully researched by Prudential and was endorsed and sponsored by PSI; PSI had a very good track record with similar investments; the sponsor affiliated with PSI in the offering was knowledgeable and reputable in the field and had a very good track record with similar investments.

With respect to each of the energy income and energy growth fund limited partnership interests, plaintiffs allege that Smith, pursuant to the scripts, made the following false representations to them: the investment was as safe and secure as a certificate of deposit (CD) with a far better return; the investment was solid, low risk, with long-term potential for excellent appreciation while producing a tax-advantaged cash flow; the partnership had been fully researched by PSI and was endorsed and sponsored by PSI; PSI had a very good track record with similar investments; the sponsor affiliated with Prudential in the offering was knowledgeable and reputable in the field; Prudential had independent expertise in the field and would contribute to the oversight of the investment; Prudential Insurance was a participant in and was committing its own funds to the partnership; prior similar partnerships were performing as expected or better; and the prior partnerships were paying returns as projected or higher.

In addition to the false representations made by defendants, plaintiffs allege that defendants failed to disclose the following relevant information: the limited partnership investments were highly unsuited to plaintiffs' investment objectives; the limited partnerships were highly risky and speculative with no long-term potential for excellent appreciation due to the high front-end loads (commissions) charged by PSI; the limited partnerships had not been fully researched by PSI but had been chosen because Darr and others in the DIG stood to gain through secret arrangements and kickbacks from the partnerships' sponsors and management; neither PSI nor Prudential had a good track record with similar investments; and the sponsors of certain limited partnerships were chosen not for their expertise but because Darr and

the DIG stood to benefit most from the arrangements and packages negotiated with them.

Plaintiffs did not learn the true facts until much later. During the relevant period neither Smith nor any other defendant ever departed from the scripts provided by PSI and the DIG, and they gave out no detrimental information about the partnerships, PSI, or the limited partnership sponsors or executives. In 1988 Smith left PSI's employ and began working for Sutro & Co. Plaintiffs took their accounts to Sutro & Co. with Smith. Smith, and the plaintiffs through Smith, continued to rely upon PSI and the DIG for information concerning their limited partnership investments. Smith was repeatedly reassured that there was nothing wrong with the investments and that plaintiffs had good expectations of profit. In addition, PSI mailed monthly statements of account to the plaintiffs which failed to disclose the decline in value of the investments and instead showed the values of the investments as equal to their cost and added that amount to plaintiffs' "net worth" shown on the statements.

Through 1991 PSI's monthly statements of account continued to reflect values equal to cost, but in 1992 the statements began to carry the disclaimer that the face amounts did not reflect current value. In the meantime, beginning in the fall of 1991, the DIG personnel ceased responding to Smith's inquiries and referred him directly to the limited partnership sponsors and product wholesalers. Smith was unable to get specific answers to his questions. He referred plaintiffs to the partnership principals but they too were unable to obtain information. Smith then advised plaintiffs to obtain legal advice.

## DISCUSSION

RICO is contained in title 18 or the United States Code, sections 1961 through 1968. It is aimed at "racketeering activity" and to this end, among other civil and criminal remedies, creates a private cause of action for treble damages by providing "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." (18 U.S.C. § 1964(c).)

■ Although RICO provides for a private cause of action in federal district court, the California Supreme Court has held that state courts have concurrent jurisdiction over RICO claims. (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 908 [221 Cal.Rptr. 575, 710 P.2d 375].) In exercising this

jurisdiction state courts are applying and, where necessary, interpreting federal statutory law. In this respect the decisions of the United States Supreme Court are binding and the decisions of the lower federal courts are entitled to great weight, but where federal precedents are in conflict or simply lacking, then we must make an independent determination of federal law. (*Alicia T.* v. *County of Los Angeles* (1990) 222 Cal.App.3d 869, 879 [271 Cal.Rptr. 513].)[6]

The scope of RICO and its application in varying circumstances have not been fully settled and in fact are subject to considerable conflict in the lower federal courts. RICO was enacted as a chapter of the Organized Crime Control Act of 1970, and sprang from a concern over the infiltration of legitimate business by organized crime. (*Reves* v. *Ernst & Young* (1993) 507 U.S. __ [122 L.Ed.2d 525, 532, 113 S.Ct. 1163]; *Sedima, S. P. R. L.* v. *Imrex Co.* (1985) 473 U.S. 479, 499-500 [87 L.Ed.2d 346, 360-361, 105 S.Ct. 3275].) Although RICO's origins would suggest that it is concerned with defendants who might be described as "mobsters," "gangsters," and similar appellations, in fact its reach is broad and includes otherwise law-abiding businesses and persons who violate its provisions. (*Sedima, S. P. R. L.* v. *Imrex Co., supra*, 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *Cianci* v. *Superior Court, supra*, 40 Cal.3d at pp. 908-909.)

Perhaps due to its origins, the civil remedies provided by RICO were not widely pursued immediately after its enactment and as a result RICO went through a period of dormancy from which it did not emerge until the mid-1980's. (See *Sedima, S. P. R. L.* v. *Imrex Co., supra*, 473 U.S. at p. 481, especially fn. 1 [87 L.Ed.2d at p. 349].) Since that time courts have struggled to define the scope and requisites of a RICO cause of action with, as we have noted, disparate and conflicting results. In *Sedima, S. P. R. L.* v. *Imrex Co., supra*, 473 U.S. at page 500 [87 L.Ed.2d at page 361], the high court "recognize[d] that, in its private civil version, RICO is evolving into something quite different from the original conception of its enactors." The court also recognized the legitimacy of concerns over the misuse of RICO by private plaintiffs as a potential consequence of an unbridled reading of the statute. (*Id.* at p. 481 [87 L.Ed.2d at p. 349].) Nevertheless, to some extent this is the result of "Congress' self-consciously expansive language" and to the extent defects are inherent in the statute as written, their "correction must

---

[6]It is also appropriate to note here the distinction between substantive law and matters of practice and procedure. The general rule is that when a federal cause of action is pursued in a state court, state law is controlling with respect to matters of practice and procedure, in the absence of any contrary provision in the federal statute. (*Bach* v. *County of Butte* (1983) 147 Cal.App.3d 554, 561-562 [195 Cal.Rptr. 268].) However, this rule must be applied in a manner that does not permit over-exacting local pleading requirements to become substantive limitations on the federal statutory right. (*Ibid.*)

lie with Congress." (*Id.* at pp. 497-498, 499 [87 L.Ed.2d at pp. 359-360, 361]; see also *H. J. Inc.* v. *Northwestern Bell Telephone Co.* (1989) 492 U.S. 229, 249 [106 L.Ed.2d 195, 214, 109 S.Ct. 2893].) In short, courts may not engage in statutory amendment in the guise of interpretation. (*Ibid.*)

Prohibited activities under RICO are contained in title 18, United States Code section 1962, which we have set forth in the margin.[7] That section provides four categories of activity which will violate RICO and thus give rise to the civil and criminal remedies provided. Leaving aside the collection of an unlawful debt, which is not arguably involved here and to which we need not further refer, each of the four categories of RICO violation is triggered by a pattern of racketeering activity. Subsection (a) prohibits using income derived from a pattern of racketeering activity to invest in, establish, or operate an enterprise which is engaged in or affects interstate commerce. Subsection (b) prohibits using a pattern of racketeering activity to acquire or maintain an interest in or control of such an enterprise. Subsection (c) prohibits using a pattern of racketeering activity in the conduct of such an enterprise's affairs. Subsection (d) prohibits conspiring to violate the previous three subsections. The various roles an enterprise may play under this section have been described by the use of the terms "prize," "instrument," "victim," and "perpetrator." (*NOW* v. *Scheidler* (1994) 510 U.S. __, __, fn. 5 [127 L.Ed.2d 99, 109, 114 S.Ct. 798] citing Blakey, *The RICO Civil Fraud*

---

[7]Section 1962 provides: "(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Prior to 1988 this subsection committed a syntactic faux pas by referring to "subsections (a), (b), or (c) . . . ." This was corrected, without substantive change, in 1988. (Pub.L. No. 100-690 (Nov. 18, 1988) § 7033, 102 Stat. 4398.)

*Action in Context: Reflections on Bennett v. Berg* (1982) 58 Notre Dame L.Rev. 237, 307-325; see *Bennett* v. *Berg* (8th Cir. 1982) 685 F.2d 1053, affd. en banc 710 F.2d 1361.)

The all-important definitional provisions of RICO are contained in section 1961. Subdivision (1), which we have set forth in the margin,[8] defines racketeering activity by reference to particular actions that are chargeable, indictable, or punishable as criminal offenses under state or federal law. Subdivision (4) provides: " '[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" Subdivision (5) provides: " '[P]attern of racketeering activity' requires at least two acts

---

[8]Subdivision (1) provides: " 'racketeering activity' means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States, or (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act[.]"

Subdivision (1) has been the subject of numerous amendments over the years. However, the portions of that subdivision which are at issue here, mail fraud and fraud in the sale of securities, have not been altered and thus we set forth subdivision (1) in its current version without expounding upon the various amendments to its provisions.

of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]"

■ The elements of a civil RICO cause of action have been variously stated and in fact differ according to the type of prohibited activity alleged. In general, however, the plaintiff must prove that the defendant caused injury to the plaintiff's business or property by engaging in a pattern of racketeering activity in connection with an enterprise which affects interstate commerce.

For an act or omission to qualify as racketeering activity, it must be included in the list of activities set forth in title 18 United States Code section 1961(1). While that list is lengthy, it does not include every criminal or civil wrong a person or entity might commit, and excluded actions, no matter how grievous, cannot qualify as racketeering activity within the meaning of RICO. (*McMartin* v. *Children's Institute International* (1989) 212 Cal.App.3d 1393, 1406-1407 [261 Cal.Rptr. 437].) In addition, a common element of all actions included in the list is a requirement that the action be criminal in nature, that is, that it be chargeable, indictable, or punishable as a crime. However, while the conduct must be criminal, there is no requirement that it have been charged in a criminal proceeding or have been the subject of a prior conviction. (*Sedima, S. P. R. L.* v. *Imrex Co., supra,* 473 U.S. at p. 488 [87 L.Ed.2d at pp. 353-354].)

■ To support a claim under RICO, it is not enough that the defendant engaged in a racketeering activity; rather, the plaintiff must also establish a pattern, of racketeering activity. In this respect RICO is vague, stating only that a pattern requires at least two predicate acts of racketeering activity. (18 U.S.C. § 1961(5).) In common parlance two of anything rarely forms a pattern, and it appears clear that Congress intended to require a minimum of two acts but not to provide that two acts are necessarily sufficient. (*Sedima, S. P. R. L.* v. *Imrex Co., supra,* 473 U.S. at p. 496, fn. 14 [87 L.Ed.2d at pp. 358-359].) In *H. J. Inc.* v. *Northwestern Bell Telephone Co., supra,* 492 U.S. at pages 239 through 243 [106 L.Ed.2d at pages 207-210], the court eschewed rigid formulae and held that the determination of a pattern of racketeering activity requires case-specific analysis of the facts with emphasis on the relationship and continuity of the predicate acts. In this analysis, "relationship" refers to the predicate acts' relationship with each other with regard to whether they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " (*Id.* at p. 240

[106 L.Ed.2d at p. 208], quoting 18 U.S.C. § 3575(e).) "Continuity" refers to whether the predicate acts amount to or pose a threat of continuing racketeering activity. (492 U.S. at p. 239 [106 L.Ed.2d at p. 208].) It "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition." (*Id.* at p. 241 [106 L.Ed.2d at p. 209].)

■ RICO is concerned with racketeering activity in connection with an enterprise that engages in or affects interstate commerce and it is, again, vague with respect to the "enterprise" requirement. The definitional portions of RICO do not provide a meaning for the term but simply set forth a broad inclusive list that essentially permits any person, entity or group to be an "enterprise." The required enterprise may be either "legitimate" or "illegitimate," that is, it does not matter whether or not the enterprise itself is criminal in nature. (*United States* v. *Turkette* (1981) 452 U.S. 576, 580-581 [69 L.Ed.2d 246, 252-253, 101 S.Ct. 2524].) And while the concept of an enterprise implies some sort of goal, the goal need not be profit oriented or economic in nature. (*NOW* v. *Scheidler, supra,* 510 U.S. at p. __ [127 L.Ed.2d at p. 111].)

RICO does not purport to provide redress for any and all injuries that may be attributed to a violation; rather, it is limited to injury to a person's business or property. (18 U.S.C. § 1964(c).) In *Sedima, S. P. R. L.* v. *Imrex Co., supra,* 473 U.S. at page 495 [87 L.Ed.2d at page 358], the court held that RICO does not require some sort of special "racketeering injury"; rather, it is sufficient that the defendant engaged in a pattern of racketeering activity in a manner forbidden under RICO and the activities injured the plaintiff in his business or property. Subsequently, in *Holmes* v. *Securities Investor Protection Corporation* (1992) 503 U.S. 258, 268 [117 L.Ed.2d 532, 544-545, 112 S.Ct. 1311], the court held that a compensable RICO injury must do more than meet a "but for" test of causation; it must also meet a test of proximate cause similar to that for recovery of antitrust damages under section 4 of the Clayton Act (15 U.S.C. § 15), which requires that the injury be the direct result of the wrong.[9] However, in *NOW* v. *Scheidler, supra,* 510 U.S. at pp. __-__ [127 L.Ed.2d at pp. 107-108], the court held that at the

---

[9]The standard of proximate causation under RICO, as adopted from the Clayton Act, is not the same as the test for proximate cause under California negligence law. The concept of proximate cause is, essentially, a judicial tool for establishing some limit to the liability which may attach to a person's actions. (*Holmes* v. *Securities Investor Protection Corporation, supra,* 503 U.S. at p. 268 [117 L.Ed.2d at p. 544].) In general, under California negligence principles the chain of proximate causation will not be deemed broken regardless of intervening causes if the risk of harm was foreseeable. (See 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 965-996, pp. 354-387.) In contrast, under RICO, there is a requirement of some direct relationship between the injury asserted and the injurious conduct alleged, so that secondarily injured persons, those injured through some intervening cause, cannot recover regardless of foreseeability. (*Holmes* v. *Securities Investor Protection Corporation, supra,* 503 U.S. at pp. 268, 271 [117 L.Ed.2d at pp. 544, 546].)

pleading stage it is sufficient that the plaintiff allege an injury "fairly traceable" to the defendant's wrongful conduct.

The particular role that these elements will play in a RICO action will necessarily vary according to the type of racketeering activities which form the predicate acts (18 U.S.C. § 1961(1)), and the type of prohibited activity under RICO (18 U.S.C. § 1962). For example, in *Holmes* v. *Securities Investor Protection Corporation, supra,* although it was unnecessary to resolve the issue, the court noted that the circuit courts of appeals were divided on the question whether a RICO action based upon securities fraud has the same standing requirements as a cause of action based directly upon securities fraud, namely, that the plaintiff be a purchaser or seller of the subject securities. (503 U.S. at pp. 275-276 [117 L.Ed.2d at p. 549].) And in *Reves* v. *Ernst & Young, supra,* 507 U.S. at p. ___ [122 L.Ed.2d at p. 540], the court held that while section 1962(a) and (b) may be applied to enterprise "outsiders," subdivision (c) can be applied to only one who participates in some way in the operation or management of the enterprise itself, although subdivision (c) is not limited to upper management or official positions.

This brings us to the specific issues tendered in this proceeding on writ of mandate. We will first consider, and then reject, defendants' assertion that relief should be denied because plaintiffs have not and cannot allege the existence of a RICO enterprise.[10] Defendants cite a number of points taken from decisional authorities which they assert are fatal to plaintiffs' claims. However, the requirement of RICO with respect to an "enterprise" is an area in which generalizations are particularly inappropriate and indiscriminate application of isolated statements from decisional authorities should be avoided. Although, as we have noted, the United States Supreme Court has held that a RICO enterprise may be wholly criminal and that an economic purpose is not required, that court has not otherwise settled the "enterprise" issue. The decisions of the lower federal courts are in real and apparent conflict on this issue. Although in some instances the apparent conflicts can be reconciled, in other respects the decisions are simply contradictory.

We must begin with the United States Supreme Court's decision in *United States* v. *Turkette, supra,* 452 U.S. 576 [69 L.Ed.2d 246]. In that case the

---

[10]The trial court sustained the demurrer to the third amended complaint for the failure to plead predicate acts of racketeering activity sufficiently, and the failure to allege sufficiently a RICO conspiracy. Defendants assert that demurrers to the original complaint and the first amended complaint were sustained in part on the ground of the failure to allege a RICO enterprise. They argue that this defect continues and that even if the trial court erred in sustaining the demurrer to the third amended complaint on the grounds it stated, extraordinary relief should be denied on this alternative ground.

court of appeals had reversed a criminal RICO conviction on the ground that RICO's enterprise requirement does not include organizations that are exclusively criminal, reasoning in part that a contrary conclusion would merge the "enterprise" and "pattern of racketeering activity" elements of the offense. The Supreme Court reversed the decision of the court of appeals, noting that the conclusion that a wholly criminal enterprise comes within the ambit of the statute does not necessarily mean that a pattern of racketeering activity is an enterprise. (*Id.* at p. 583 [69 L.Ed.2d at p. 254].) The enterprise requirement refers to an entity, which for purposes of *Turkette* consisted of a group of persons associated together for a common purpose of engaging in a course of conduct. (*Ibid.*) An enterprise can be proven by evidence of an ongoing organization, formal or informal, and by evidence that the associates function as a continuing unit. (*Ibid.*) A pattern of racketeering activity consists of a series of criminal acts as defined by the statute and which is proven by evidence of the acts committed by participants in the enterprise. (*Ibid.*) The two concepts remain separate elements that must be proven. (*Id.* at p. 583 [69 L.Ed.2d at pp. 254-255].)

The decision in *Turkette* gives rise to certain misconceptions that find expression in defendants' arguments and in some appellate decisions. First, although the court referred to an "enterprise" as an "entity," it was not referring to a legal entity or an entity with any particular form or structure. RICO is clear that an enterprise may be a legal entity but also may be "any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).)[11] Thus, in referring to an "entity," the court in *Turkette* was not implying that an enterprise must take some formal or legally recognized form. From this we perceive two corollaries that are contrary to some of the suggestions in decisional authorities: (A) What is necessary under RICO is that the plaintiff establish the existence of an enterprise, not that it be given a name. The very nature of informal associations, particularly those that engage in criminal conduct, belies the possibility that in all instances such associations will have an identifiable appellation. (B) RICO defendants cannot insist that, through some sort of process of elimination, a specifically identified legal entity must be the RICO enterprise the plaintiff is trying to establish. Any legal entity can be a "person," capable of violating RICO (18 U.S.C. §§ 1961(3), 1962), and simply because such a legal entity is itself a group or association does not mean that it perforce must be also the RICO enterprise.

Second, the *Turkette* court did not hold, as defendants suggest, that a RICO plaintiff must establish an enterprise which has a purpose separate and

---

[11]In contrast, a "person" within the meaning of RICO "includes any individual or entity capable of holding a legal or beneficial interest in property[.]" (18 U.S.C. § 1961(3).) This definition implies legal recognition, while the definition of enterprise specifically rejects such a requirement.

distinct from the pattern of racketeering activity in which it engages. Rather, the court held that the enterprise element is a separate element from the pattern of racketeering activity requirement and that proof of a pattern of racketeering activity does not ipso facto establish an enterprise. But the court recognized that in particular cases the proof used to establish these elements may coalesce. (452 U.S. at p. 583 [69 L.Ed.2d at pp. 254-255].) And the court upheld a RICO conviction even though the only purpose of the enterprise was to engage in a pattern of racketeering activity. (*Ibid.*)

■ Accordingly, under *Turkette*, and in light of the plain language of RICO, we reject the suggestion that a RICO enterprise must have an existence separate and apart from the racketeering activities in which the enterprise engages.[12]

Following the decision in *Turkette* the primary focus of the decisions concerning the RICO enterprise requirement shifted to whether a RICO enterprise can also be a RICO defendant. In this respect, and contrary to defendants' assertion that the matter is well-settled, the decisions of the lower federal courts are scattered over the entire legal spectrum. The factors addressed by the courts in this respect fall into two categories, these being policy considerations and the statutory language.

---

[12]The distinction the court attempted to emphasize in *Turkette* is that an enterprise is a thing while racketeering activities are actions. Thus, an enterprise is, and racketeering activities are, what it does. (452 U.S. at p. 583 [69 L.Ed.2d at pp. 254-255].) Recognition that the commission of racketeering activities may be the only purpose for which the enterprise exists and that the evidence of each may coalesce does not mean that there has been a merger of these two different concepts. (*Id.* at p. 583 [69 L.Ed.2d at pp. 254-255].) Accordingly, although an enterprise and a pattern of racketeering activity remain separate elements of a RICO cause of action, so long as an enterprise is shown to exist RICO does not require that it have any purpose other than the commission of the racketeering activities. (*Ibid.*) Despite the Supreme Court's efforts in *Turkette*, some authorities continue to suggest that a RICO enterprise must be shown to have an existence "separate and apart" from the racketeering activities in which it is claimed to have engaged. (See *Medallion TV Enterprises, Inc.* v. *SELECTV of California, Inc.* (C.D.Cal. 1986) 627 F.Supp. 1290, 1294; *Allington* v. *Carpenter* (C.D.Cal. 1985) 619 F.Supp. 474, 478.) In our view, this reading of the RICO statute is erroneous. A RICO enterprise must be shown to have existed and is not shown to have existed simply because someone engaged in racketeering activities, but proof of the enterprise's existence need not disregard the racketeering activities in which it engaged. This is not to suggest that a RICO enterprise can be shown simply by evidence that multiple parties engaged in racketeering activities. RICO enterprises fall into the categories of legal entities, including individuals, and associations in fact that have no legal recognition. (*United States* v. *Turkette, supra*, 452 U.S. at pp. 581-582 [69 L.Ed.2d at pp. 253-254].) Legal entities normally will have an existence and at least nominal purpose independent of any racketeering activities in which they engage while associations in fact may not. But even where the proof of the association and the activities in which it engages coalesces, the enterprise and its activities remain separate elements. (*Ibid.*) It has been said that it may be easier to establish a RICO enterprise where a legal entity rather than an association in fact is involved. (*Bennett* v. *Berg, supra*, 685 F.2d at pp. 1060-1061.) While that may be true, on demurrer we are not concerned with difficulties of proof.

The policy consideration argument proceeds from recognition that under RICO the enterprise itself will often be the victim, or at least the prize or passive instrument, of the RICO violation, and thus concludes that it would be anomalous to subject such an enterprise to RICO's sanctions. (See *Bennett* v. *United States Trust Co.* (2d Cir. 1985) 770 F.2d 308, 315.) We perceive little persuasive value in the policy argument. The Supreme Court has recognized that among the roles an enterprise may play under RICO is that of perpetrator. (*NOW* v. *Scheidler, supra,* 510 U.S. at p. __, fn. 5 [127 L.Ed.2d at p. 109].) To conclude that an enterprise can never be a RICO defendant because in some cases it may be an innocent victim, prize or passive instrument, would be to throw the proverbial baby out with the bath water. Moreover, the Supreme Court has repeatedly rebuffed the lower federal courts' attempts to limit RICO by reference to perceived policy considerations which do not find expression in the statutory language. (*Id.* at pp. __-__ [127 L.Ed.2d at pp. 109-111]; *Sedima, S. P. R. L.* v. *Imrex Co., supra,* 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *United States* v. *Turkette, supra,* 452 U.S. at p. 587 [69 L.Ed.2d at p. 257].) Accordingly, we turn to the statutory language.

Title 18 United States Code section 1962, sets forth four types of prohibited activity under RICO. Although subsections (a), (b), and (d) contain no similar language, there is language in subsection (c) that supports the view that an enterprise cannot be the RICO defendant under that subsection. Specifically, that subsection makes it unlawful for a person "employed by or associated with" an enterprise to conduct or participate in conducting the enterprise's affairs through a pattern of racketeering activity. Some courts have noted that an enterprise cannot be employed by or associated with itself, and therefore have concluded that under that subsection the enterprise cannot be the RICO violator. (See *B.F. Hirsch* v. *Enright Refining Co., Inc.* (3d Cir. 1984) 751 F.2d 628, 633.) Although section 1964(c) provides that an injured party may bring an action, it does not say against whom the action may be pursued. When faced with that question some courts have held that the enterprise can also be the defendant under RICO. (See, e.g., *United States* v. *Hartley* (11th Cir. 1982) 678 F.2d 961, 988.) Other courts have held that, at least under subsection (c), the enterprise cannot be the RICO violator and therefore cannot be the RICO defendant. (See, e.g., *Bennett* v. *Berg, supra,* 685 F.2d at pp. 1061-1062, affd. en banc 710 F.2d 1361; *United States* v. *Computer Sciences Corp.* (4th Cir. 1982) 689 F.2d 1181, 1190 [68 A.L.R. Fed. 783].) Among these latter cases, some courts have qualified the holding by saying that the enterprise cannot be the RICO defendant in the absence of active participation in the violations. (See *Dakis on Behalf of Dakis Pension Plan* v. *Chapman* (N.D.Cal. 1983) 574 F.Supp. 757, 760.) Other courts have suggested that an enterprise may be found liable under principles

of respondeat superior, at least where it accepts and benefits from the unlawful activities of its associates (see *Davis* v. *Mutual Life Ins. Co. of New York* (6th Cir. 1993) 6 F.3d 367, 379), although other courts have rejected respondent superior in RICO actions (see *Prochaska & Associates, Inc.* v. *Merrill Lynch* (D.C.Neb. 1992) 798 F.Supp. 1427, 1432). It has also been suggested that the language of subsection (c) precludes an enterprise from being named defendant under any of the subsections of section 1962. (*Cashco Oil Co.* v. *Moses* (N.D.Ill. 1985) 605 F.Supp. 70, 71.)

What appears to be the majority view was set forth in *Haroco* v. *American Nat. B. & T. Co. of Chicago* (7th Cir. 1984) 747 F.2d 384, affirmed on other grounds in *American National Bank & Tr. Co.* v. *Haroco, Inc.* (1985) 473 U.S. 606 [87 L.Ed.2d 437, 105 S.Ct. 3291]. In *Haroco*, the court of appeals agreed that under subsection (c) of section 1962 the enterprise cannot also be the liable person. (747 F.2d at p. 400.) However, the court also noted that the RICO liability of an enterprise should depend on the role it played in the scheme and concluded that the RICO provisions had already taken that consideration into account. (*Id.* at p. 401.) Subsection (a) of section 1962 prohibits a person who has participated as a principal in a pattern of racketeering activity from investing or reinvesting income derived directly or indirectly from such activities in the establishment or operation of an enterprise. That subsection contains no language that would prevent the enterprise from also being the liable person and under that subsection a participating enterprise may be a RICO defendant. (747 F.2d at p. 402.) "This approach to subsection (a) thus makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering." (*Ibid.*; see also *Schofield* v. *First Commodity Corp. of Boston* (1st Cir. 1986) 793 F.2d 28, 31.) We would also note that neither subsection (b) nor subsection (d) contains language that would prevent an enterprise from being named defendant in a RICO action if the enterprise otherwise violated those subsections.

In view of the disparate and conflicting authorities on this issue, it appears that one could find decisional authority for virtually any position one wished to take. However, our concern here is not in attempting to resolve all of the conflicts among various authorities, but is in determining whether under the circumstances the plaintiffs have sufficiently alleged a RICO cause of action against the defendants. ■ The points we can distill from the conflicting decisional authorities, which we find controlling here, are as follows:

First, where the RICO enterprise is an association in fact and not a legal entity, the problem will not arise. Assuming that such an association has

sufficient status that it could otherwise be subjected to suit, it would not qualify as a "person" subject to suit under RICO. (*U.S.* v. *Bonanno Org. Crime Fam. of La Cosa Nostra* (2d Cir. 1989) 879 F.2d 20, 27-30.) Accordingly, the issue can arise only where the RICO enterprise has sufficient status to qualify as a "person" under title 18 United States Code section 1961(3), for only then can the enterprise be a potential defendant.

Second, since an enterprise must be established but need not be anything other than an association in fact and need not be given a nominal identifier, a named defendant that is a legal entity will not necessarily be the RICO enterprise and cannot claim automatic immunity under the authorities which hold that the RICO enterprise cannot also be a RICO defendant. This is not to say that a plaintiff can avoid the issue by claiming the existence of a nondefendant RICO enterprise when there are no facts to establish the existence of an enterprise separate from a named defendant, but it is to say that the largest or most comprehensive legal entity identified in the complaint is not ipso facto immune.

Third, while a majority of lower federal courts have held that a RICO enterprise cannot be a RICO defendant under subsection (c) of section 1962, the overwhelming majority of those courts have concluded that there is no impediment to naming the RICO enterprise as defendant under the other subsections of section 1962. In view of the Supreme Court's frequent admonishment that RICO may not be restricted beyond the limitations inherent in its statutory language, we are satisfied that is the correct view even if we assume the enterprise cannot be a defendant under subsection (c). Of course, as with other limitations, a plaintiff cannot avoid the issue simply by claiming a violation of subsection (a), (b) or (d) in the absence of facts to support such a claim.

In applying these principles to plaintiffs' claims, we find sufficient allegations to meet the RICO enterprise requirement. Plaintiffs' complaint identifies 22 limited partnerships in which they purchased interests.[13] A limited partnership may be an enterprise within the meaning of RICO. (*United States* v. *Cauble* (5th Cir. 1983) 706 F.2d 1322, 1340; *Bloch* v. *Prudential-Bache Securities* (W.D.Pa. 1989) 707 F.Supp. 189, 193; *In re Rexplore, Inc. Securities Litigation* (N.D.Cal. 1987) 671 F.Supp. 679, 589-690.) Raising capital through the sale of limited partnership interests is certainly an affair of a limited partnership and plaintiffs have alleged that

---

[13]Plaintiffs purchased their interests at different times and in different capacities and/or combinations. In some instances their investments were made in partnerships in which one or more of them had earlier made an investment. The list set forth in plaintiffs' complaint reflects 39 purchases of interests in 22 different limited partnerships.

defendants and others participated in raising capital for the limited partnerships through a pattern of racketeering activity. Nothing in RICO suggests that all as opposed to some portion of an enterprise's affairs must be involved in the pattern of racketeering activity and nothing in RICO suggests that the pattern of racketeering activity in which the defendants engaged must be limited to a single enterprise. Plaintiffs' claim that defendants engaged in a pattern of racketeering activity in the conduct of the affairs of 22 different enterprises is not fatally deficient.

From the complaint it appears that in creating, structuring, selling interests in, and operating the various limited partnerships, PSI and other Prudential affiliates associated with certain "sponsors" or cogeneral partners, such as VMS, Watson & Taylor, Graham Resources, Polaris, and the Franklin Realty Group. Each of the sponsors teamed with PSI, the DIG and other Prudential affiliates to create multiple limited partnerships which could then be marketed through PSI's channels. Although each of the limited partnerships would itself qualify as an enterprise, so also would the Prudential affiliates' association with each sponsor to produce limited partnerships on a continuing basis. In short, when PSI associated with other entities to create multiple limited partnerships that could be marketed through a pattern of racketeering activities, that association in fact was an enterprise within the meaning of RICO.

In addition, the plaintiffs have identified an enterprise within the Prudential conglomerate. It appears Prudential Insurance is the overall parent corporation of numerous subsidiaries and other affiliates. Plaintiffs have alleged that PSI joined with other Prudential affiliates, namely Prudential-Bache Properties, Inc., and Prudential-Bache Energy Production, Inc., in creating, structuring, selling interests in, and operating the limited partnerships that are at issue. The association of these separate entities on an ongoing basis is a sufficient enterprise for purposes of RICO. This enterprise is not necessarily Prudential Insurance itself, but is an association in fact which, as we have noted, need not have or be given a name.

Finally, PSI is itself an enterprise under RICO. Assuming arguendo that PSI cannot be both enterprise and defendant under section 1962(c), that limitation does not apply to section 1962(a). Essentially, subsection (a) is aimed at investing or reinvesting in an enterprise with income derived from a pattern of racketeering activities. (*United States* v. *Turkette, supra,* 452 U.S. at p. 584 [69 L.Ed.2d at p. 255].) That provision can be violated by using racketeering-generated proceeds in one's own operations. (*Haroco* v. *Amercian Nat. B. & T. Co. of Chicago, supra,* 747 F.2d at p. 402.) According to plaintiffs, PSI utilized a significant portion of the proceeds derived from

the sale of limited partnership interests to create incentives for its sales representatives to push PSI's limited partnership investments to plaintiffs and other customers. These incentives included extremely high commissions when compared to stocks, bonds and other investments, the payment and promise of payment of "residuals" from PSI and its affiliates' limited partnership income, and fully paid trips and vacations for high producers. This alleged use of racketeering-generated income to foster and promote PSI's business through its racketeering scheme is a sufficient allegation of a RICO violation with PSI as the enterprise.

We need not look further to determine whether there are any other potential RICO enterprises identified in the complaint because, for the reasons just given, we are satisfied that for purposes of demurrer the plaintiffs have alleged sufficient facts to identify RICO enterprises. ▉ We turn then to the reason given by the trial court for sustaining the demurrer, that is, the failure to allege racketeering activities.

Title 18 United States Code section 1961(1), provides a lengthy list of the criminal actions that can constitute racketeering activities. Included in this list are indictable acts of mail fraud in violation of title 18 United States Code section 1341 (18 U.S.C. § 1961(1)(B)), and fraud in the sale of securities (18 U.S.C. § 1961(1)(D)). Plaintiffs purport to rely upon, and the trial court found they failed to allege sufficiently, acts of securities fraud and mail fraud. We shall address the securities fraud allegations first.

One of the principal purposes of federal securities legislation has been the prevention of fraud, and antifraud provisions are interspersed throughout many of the securities statutes enacted by Congress. (See 69A Am.Jur.2d Securities Regulation—Federal, § 1480.) The principal federal securities law antifraud provision with which we are concerned is contained in title 15 United States Code section 78j(b), which, as section 10(b) of the Securities and Exchange Act of 1934, is commonly called section 10(b), a nomenclature to which we will adhere.[14] Section 10(b) makes it unlawful for any person, directly or indirectly, through any means or instrumentality of

---

[14]RICO predicate acts based on fraud in the sale of securities are not limited to any particular provision, act or title. The trial court considered section 10(b) of the 1934 act as well as section 12(2) of the Securities Act of 1933. Section 12(2), located in title 15 United States Code section 77l(2), provides for civil liability of any person who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." A willful violation of this provision is a crime. (15 U.S.C. § 77x.) Since we find plaintiffs' complaint sufficient under section 10(b), we need not address this provision of the 1933 act.

interstate commerce, the mails, or any facility of any national securities exchange, "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Section 10(b) has been implemented by the adoption of federal rule 10b-5, which provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, [¶] (a) To employ any device, scheme, or artifice to defraud, [¶] (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or [¶] (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (17 C.F.R. § 240.10b-5 (1994), hereafter Code of Federal Regulations rule 10b-5.)

 Among the purposes of section 10(b) and Code of Federal Regulations rule 10b-5 are to preserve the integrity of the securities markets and to create a high standard of ethics in the securities industry by promoting a policy of full disclosure. (*Santa Fe Industries, Inc.* v. *Green* (1977) 430 U.S. 462, 477 [51 L.Ed.2d 480, 494, 97 S.Ct. 1292]; *Supt. of Insurance* v. *Bankers Life & Cas. Co.* (1971) 404 U.S. 6, 12 [30 L.Ed.2d 128, 134, 92 S.Ct. 165].) These provisions are to be construed liberally to effectuate Congress's remedial purposes rather than technically or restrictively. (*Herman & MacLean* v. *Huddleston* (1983) 459 U.S. 375, 386-387 [74 L.Ed.2d 548, 558-559, 103 S.Ct. 683].)

 Some of the factual predicates essential to federal securities laws violations are not subject to dispute here. There is no dispute that defendants' interstate marketing of limited partnership interests sufficiently implicated interstate commerce as to come within the federal regulatory jurisdiction. There can be no doubt that the limited partnership interests marketed by defendants are securities within the meaning of federal law. (*Siebel* v. *Scott* (5th Cir. 1984) 725 F.2d 995, 998-999.) And, assuming that the standing requirement of securities laws (that the plaintiff be a purchaser or seller of securities) is applicable in a RICO action (*Holmes* v. *Securities Investor Protection Corporation, supra,* 503 U.S. at pp. 275-276 [117 L.Ed.2d at p. 549], noting but not resolving the issue), there is no question that plaintiffs here were purchasers of securities.

 It may be said that in order to state a cause of action under section 10(b) and Code of Federal Regulations rule 10b-5, a plaintiff must allege (1)

the defendant misrepresented or omitted to state material facts in connection with the purchase or sale of a security; (2) the plaintiff justifiably relied to his or her detriment upon the defendant's misrepresentations or omissions; and (3) the defendant made the misrepresentations with scienter, that is, with an intent to deceive, manipulate or defraud the plaintiff. (*Ernst & Ernst* v. *Hochfelder* (1976) 425 U.S. 185, 201 [47 L.Ed.2d 668, 681, 96 S.Ct. 1375]; *Blue Chip Stamps* v. *Manor Drug Stores* (1975) 421 U.S. 723, 731 [44 L.Ed.2d 539, 546-547, 95 S.Ct. 1917].)

With two caveats the elements of a cause of action under section 10(b) and Code of Federal Regulations rule 10b-5 are essentially identical to a state cause of action for fraud. The first caveat relates to the type of misconduct at issue. To implicate federal law the fraud must be involved in the actual purchase or sale of a security, and thus a broad range of general business or corporate misconduct is excluded. (See *Santa Fe Industries, Inc.* v. *Green, supra,* 430 U.S. at pp. 474-476 [51 L.Ed.2d at pp. 492-493].) Second, negligent misrepresentation is insufficient under federal law; a violation of section 10(b) and Code of Federal Regulations rule 10b-5 requires at least reckless conduct closely approaching conscious deception. (*Ernst & Ernst* v. *Hochfelder, supra,* 425 U.S. at p. 193 [47 L.Ed.2d at p. 677]; *McLean* v. *Alexander* (3d Cir. 1979) 599 F.2d 1190, 1197 [49 A.L.R. Fed. 373].)[15]

In federal courts the pleading requirements of a securities fraud cause of action are governed by Federal Rules of Civil Procedure, rule 9(b), which provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."[16] This rule of pleading requires that a plaintiff identify specific acts or omissions upon which a claim of fraud is based by giving such details as the

---

[15]Our state law of fraud and deceit comprehends injurious misrepresentation at levels of culpability of negligence and above. (See Civ. Code, §§ 1572, 1710; *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487-488 [275 P.2d 15].) Such things as the injuries that may be redressed, the required proof, the available remedies, and the measure of compensation, may vary with the defendant's level of culpability, although the lines are often blurred. No blurring is permissible under federal law; the defendant's conduct must at least rise to the level of recklessness to support an action under section 10(b) and Code of Federal Regulations rule 10b-5.

[16]This rule of pleading is not materially different from our state rule of pleading fraud. In this state general and conclusory allegations of fraud will not suffice; in order to state a cause of action for fraud a plaintiff must allege, factually and specifically, all of the elements of the cause of action. (*Wilhelm* v. *Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1331 [231 Cal.Rptr. 355]; see 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, p. 111.) Both state and federal rules for pleading fraud require that fraud be alleged with specificity, but neither requires the pleader to go into minute detail or to allege evidentiary, as opposed to ultimate, facts.

time, date, places or other details of the alleged fraudulent involvement of the defendants. (*Goldman* v. *Belden* (2d Cir. 1985) 754 F.2d 1059, 1070.) Such things as knowledge, intent, and scienter may be pleaded generally, although some federal courts have nonetheless required that sufficient facts be pled to give rise to a strong inference of fraudulent intent (*O'Brien* v. *National Property Analysts Partners* (2d Cir. 1991) 936 F.2d 674, 676; *Ross* v. *A. H. Robins Co.* (2d Cir. 1979) 607 F.2d 545, 558, or at least some inference of scienter (see *Greenstone* v. *Cambex Corp.* (1st Cir. 1992) 975 F.2d 22, 25; but see *In re Glenfed, Inc. Securities Litigation* (9th Cir. 1994) en banc 42 F.3d 1541, vacating and remanding *In re Glenfed, Inc. Securities Litigation* (9th Cir. 1993) 11 F.3d 843, 847-848, and rejecting any heightened pleading requirement.)

We need not attempt to resolve the conflict in federal authorities with respect to the pleading requirements for sceinter, for we find plaintiffs' complaint sufficient to meet even the more stringent standard, that is, to give defendants notice of precisely with what they are charged, which is all that is required. (*Goldman* v. *Belden, supra,* 754 F.2d at p. 1070.) Plaintiffs provided a list, including the date, of each limited partnership interest they purchased in reliance on defendants' alleged misrepresentations and omissions. The misrepresentations and omissions were made immediately before each purchase as an inducement of the purchase. The misrepresentations were obviously made in Stockton, where plaintiffs had their accounts. The statements were made by Smith, under the direction of Baker, pursuant to fact sheets and uniform "scripts" prepared by Darr and others in the DIG and distributed by PSI through its network of agents. Plaintiffs have identified the misrepresentations and omissions made by the defendants to induce them to purchase limited partnership interests, which we have earlier set forth and need not repeat here. The types of representations set forth by plaintiffs give rise to factual questions concerning such things as materiality, plaintiffs' reliance, and whether reliance was justified, but these questions are factual in nature and cannot support an order sustaining a demurrer. (See *Goldman* v. *Belden, supra,* 754 F.2d at pp. 1067-1070.)[17]

In sustaining the demurrer the trial court drew a distinction between civilly actionable fraud and criminal conduct. We agree there is a distinction

---

[17]Defendants' assertion that plaintiffs have failed to sufficiently identify actionable misrepresentations or omissions is not well taken. Although plaintiffs identified a number of asserted misrepresentations and omissions, the crux of their case is that defendants persuaded them to invest in risky and speculative enterprises by asserting that the investments were safe and secure. "It is a violation of the antifraud provisions of the federal securities laws to make material misrepresentations or omissions regarding the risk of an investment in a given security, or conversely, the safety of such an investment," and "[s]ecurities law violations based upon the creation of misleading impressions as to the safety or risk of a proposed investment are not limited to affirmative misrepresentations; under some circumstances those persons who offer securities for sale are under an affirmative duty to advise the potential purchasers of risks associated with the investments." (69A Am.Jur.2d Securities Regulation

but find plaintiffs' complaint sufficient to allege criminal conduct. To constitute criminal conduct a violation of federal securities laws must be "willful." (15 U.S.C. §§ 77x, 78ff(a).) "Willfulness in a securities action may be established by showing that a defendant acted with knowledge of or with reckless indifference to the 'improper goings-on' in its firm." (*Pandick, Inc.* v. *Rooney* (N.D.Ill. 1986) 632 F.Supp. 1430, 1434, citing *Edward J. Mawod & Co.* v. *Securities & Exch. Com'n* (10th Cir. 1979) 591 F.2d 588, 596.) It has been said that willfulness is shown by proof that the defendant intended to commit the prohibited act and that a specific intent to violate the statute or rule is unnecessary. (*United States* v. *Dixon* (2d Cir. 1976) 536 F.2d 1388, 1397; *Kronfeld* v. *First Jersey Nat. Bank* (D.N.J. 638 F.Supp. 1454, 1471.) It has also been said that under section 10(b) and Code of Federal Regulations rule 10b-5, willfulness is consistent with the scienter requirement. (*United States* v. *Chiarella* (2d Cir. 1978) 588 F.2d 1358, revd. on other grounds in *Chiarella* v. *United States* (1980) 445 U.S. 222 [63 L.Ed.2d 348, 100 S.Ct. 1108]; *United States* v. *Charnay* (9th Cir. 1976) 537 F.2d 341.)[18] Plaintiffs allege that they were defrauded by virtue of an orchestrated scheme complete with prepared "scripts" designed to convince them of the safety and security of what were in fact risky and speculative investments. This sufficiently alleges willfulness.

 For their predicate acts under RICO, the plaintiffs also rely upon alleged mail fraud. (18 U.S.C. § 1341.)[19] Mail fraud is committed when a person who has devised or intends to devise a scheme or artifice to defraud,

---

—Federal, *supra*, § 1183, pp. 285-286, fns. omitted.) Defendants' obligations of disclosure to plaintiffs were particularly acute here, since "[b]roker-dealers have a fiduciary relationship with their customers under common law as well as under the federal securities laws, the rules and regulations of the SEC, and the rules of the self-regulatory organizations." (*Id.*, § 1529, at p. 599.) Plaintiffs have alleged precisely the type of conduct securities laws are intended to interdict.

[18]Scienter is required, but the scienter requirement does not mean that the defendants must have intended to injure the plaintiffs. Scienter connotes an intent to deceive, manipulate, or defraud the plaintiffs, that is, to induce them to take action in reliance upon false representations. (*Ernst & Ernst* v. *Hochfelder, supra*, 425 U.S. at p. 201 [47 L.Ed.2d at p. 681]; *Blue Chip Stamps* v. *Manor Drug Stores, supra*, 421 U.S. at p. 731 [44 L.Ed.2d at p. 547].) Regardless whether defendants hoped or expected that the limited partnerships would be sufficiently successful to satisfy the plaintiffs, they intended to induce them to commit their investment capital to risky enterprises in reliance upon the false representations that the investments were safe and secure. That is scienter.

[19]At the time of defendants' actions, title 18 United States Code section 1341 provided: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing

utilizes the mails for the purpose of executing such scheme or artifice or of attempting to do so. Mail fraud requires that the mails be used as a part of the execution of a fraud or as an incident to an essential part of a fraudulent scheme. (*Parr* v. *United States* (1960) 363 U.S. 370, 390 [4 L.Ed.2d 1277, 1290, 80 S.Ct. 1171].) It is not necessary that the fraudulent scheme contemplate the use of the mails as an essential element, but on the other hand it is not sufficient in itself that the mails be in fact used as a result of the fraudulent scheme. (*United States* v. *Maze* (1974) 414 U.S. 395, 400, 405 [38 L.Ed.2d 603, 608, 611, 94 S.Ct. 645].) What is required is that the mails be used for the purpose of executing a fraudulent scheme or artifice. (*Ibid.*) But the matter placed in the mails need not itself be untruthful or otherwise constitute the fraud; rather, it is sufficient that the completion of the scheme or the prevention of its detection in some way depend upon the use of the mails. (*United States* v. *Blecker* (4th Cir. 1981) 657 F.2d 629, 636.) It is enough that the mails be used as part of a "lulling" scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud. (*United States* v. *Jones* (9th Cir. 1983) 712 F.2d 1316, 1320-1321.)

Plaintiffs have alleged that as the result of a fraudulent scheme over a four-year period they were induced to purchase numerous limited partnership investments. They did not discover the fraud until much later due to verbal reassurances and the mailing of monthly account statements which falsely reflected that their investments continued to be worth their cost, thus lulling them into inaction. This lulling effect had two consequences: it prevented plaintiffs from discovering and taking action for the fraud that had been accomplished; and it enabled defendants to continue to promote and sell additional limited partnership interests to the plaintiffs with further fraudulent representations. These allegations sufficiently plead mail fraud.

For these reasons we conclude that plaintiffs' third amended complaint adequately sets forth a RICO cause of action. Accordingly, we will grant the relief plaintiffs seek.

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to vacate its order sustaining without leave to amend the demurrer to the fifth cause of action (RICO) of plaintiffs' third amended complaint and

whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

to enter a new order overruling the demurrer in that respect. The alternative writ having served its purpose is discharged.

Raye, J., concurred.

**SIMS, J.**—I concur in Justice Sparks's scholarly opinion.

I write separately to urge our Supreme Court to reconsider its holding in *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903 [221 Cal.Rptr. 575, 710 P.2d 375] which *voluntarily assumed* state court jurisdiction over RICO actions. (*Id.* at p. 910.)

As this case well illustrates, RICO is a judicial nightmare. The vagueness of RICO's language has led to vast divisions of authority in the federal courts, and these divisions are dumped upon California courts compelled to adjudicate RICO claims. In performing that adjudication (as this case shows), California courts are forced to apply both federal substantive and procedural law. For all the reasons set forth in Justice Lucas's dissent in *Cianci* (40 Cal.3d at p. 925), California's overtaxed courts are ill-equipped to deal with RICO. Moreover, the doors of the federal district courts remain open to any California citizens wishing to press RICO claims.

The time to stop our long day's journey into the RICO nightmare is now. Our Supreme Court should reconsider *Cianci* and should decline state court jurisdiction over RICO claims.

The petition of real parties in interest for review by the Supreme Court was denied June 1, 1995.