Filed 11/25/13  McKinney v. NuScience Corp. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID McKINNEY, | B240831 (c/w B244074) |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BC469493) |
| NuSCIENCE CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Alan Rosenfield, Judge.  Affirmed.

Law Offices of Stephen Abraham and Stephen E. Abraham for Plaintiff and Appellant.

Jacobson Russell Saltz & Fingerman, Michael J. Saltz, Colby A. Petersen and Blair Schlecter for Defendant and Respondent.

* * * * * *

David McKinney (appellant) appeals from an order granting NuScience Corporation's (respondent) special motion to strike a malicious prosecution complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1]  Appellant also challenges an order awarding respondent attorney fees in the amount of $129,938.75.  We affirm both orders.

## FACTS AND PROCEDURAL HISTORY

### The Trade Secret and Ownership

Appellant was respondent's former employee.  Respondent is in the business of manufacturing and selling oxygen-based health and beauty products and other mineral supplements.  Its primary product is known as CELLFOOD, which is an oxygen and nutrient supplement containing 78 minerals, 34 enzymes, and 17 amino acids.  CELLFOOD uses a proprietary water-splitting technology to provide a stream of bio-available oxygen in addition to 129 nutrients directly to the cells.

The formula was developed by Everett Storey while he was an owner and officer of Deutrel Laboratories, Inc.  Storey willed Deutrel Laboratories and its associated businesses to Lois Ramm.  Ramm sold Deutrel Laboratories and its trade secrets to Jerald Rhoten in 1991.  Rhoten subsequently assigned the trade secrets to his family-owned company, NuScience.

### Litigation with the Henkel Family

When Ramm died in 2004, her brother, John Henkel, discovered documents containing the trade secret formula, which had been sold to Rhoten in 1991.  John subsequently threatened respondent that he would sell or use the trade secret formula unless respondent paid him a large sum of money.  Respondent ultimately obtained against John an Iowa State Court permanent restraining order and injunction prohibiting him from using, possessing, controlling or stating that he controlled or possessed respondent's trade secrets.  John was also enjoined from revealing or communicating the

---

[1]     SLAPP is an acronym for strategic lawsuits against public participation.  (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1303, fn. 1.)  All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

trade secrets to anyone. John was ordered to destroy documents, drawings, or designs containing the ingredients, formula or recipe for CELLFOOD.

John has two sons, Robert and Michael Henkel. The two sons claimed to possess documents containing CELLFOOD's formula. Robert and Michael offered to sell the formula to third parties, including respondent's customers. Robert began producing his own version of CELLFOOD called Deutrocell, which he sold over the Internet. Michael offered to sell the deuterium sulfate technology.

In April 2008, respondent filed a federal action (*NuScience Corporation v. Robert Henkel*, etc. et al., United States District Court, Central District of California, case No. CV-08-2661-GAF (FFMx) against Robert and Michael for, among other things, misappropriation of trade secrets and federal trademark infringement. Respondent obtained a default judgment against Robert and Michael in the federal action on April 14, 2009. The federal judgment prohibited Robert and Michael from using, possessing, controlling or stating that they controlled or possessed respondent's trade secrets. They were also enjoined from revealing or communicating the trade secrets to anyone and prohibited from selling respondent's proprietary trade secret information and formulas to third parties. Notwithstanding the federal judgment and restraining order, Michael offered to sell the technology on the Internet. Robert and Michael currently sell the same or similar product called Choice O2.

### Litigation with Appellant and Robert Henkel

On October 27, 2010, respondent filed a complaint entitled *Nuscience Corporation v. David McKinney*, et al., Los Angeles County Superior Court, case No. BC443331 (the underlying complaint) against appellant and Robert. The underlying complaint alleged that respondent employed appellant from October 2005 until August 29, 2008. When appellant began working for respondent, he signed a written employment agreement, whereby he agreed to maintain the confidentiality of respondent's trade secrets and other proprietary information. In August 2008, appellant signed a written separation agreement in which he agreed to a maintain confidentiality on certain matters including trade secrets and other proprietary information.

3

Respondent alleged, on information and belief, that appellant and Robert engaged in communications and conspired to disclose respondent's trade secrets and other proprietary information. Appellant was alleged to have conspired with Robert to violate the federal judgment and to defame respondent and its business reputation. Appellant allegedly made untrue and disparaging statements about respondent's business as set forth in e-mail messages, which were attached to the underlying complaint.

Respondent sought damages and injunctive relief under the following theories: breach of contract, trade libel, misappropriation of trade secrets; unfair business practices, conspiracy, civil violation of the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) and intentional inference with contract. The trade libel cause of action was based on allegations appellant falsely disparaged respondent by claiming the company did not comply with good manufacturing practices set by the U.S. Food and Drug Administration. Respondent alleged injury to its relationships with customers and a loss of business as a result of appellant's statements about the production of CELLFOOD. The misappropriation claim was based on appellant's alleged misappropriation of respondent's trade secrets by disclosure and use with Robert. The civil RICO claim was predicated on the federal judgment against Robert, which prohibited him from using or disclosing respondent's trade secret. Respondent alleged that appellant assisted Robert in violating the federal court judgment.

On June 3, 2011 the trial court granted discovery motions brought by appellant requesting additional responses. On June 24, 2011, appellant filed a motion for terminating sanctions. Appellant argued respondent's further responses lacked substance and respondent did not produce any documents which established a factual basis to support its claims against appellant. Respondent opposed the motion contending it had provided all the information it currently had and that the failure to prove a case through limited discovery was not a basis for imposing a terminating sanction.

On July 20, 2011, prior to the trial court's hearing on the motion for terminating sanctions, respondent filed a request to dismiss the underlying complaint without prejudice. In connection with the special motion to strike the malicious prosecution

4

action, respondent explained its motivation for dismissing the underlying action. In a declaration filed in support of the section 425.16 motion to strike, Kevin Negrete, respondent's president and part owner, stated that the decision to dismiss the underlying complaint was based on threats made by Robert to release on the Internet the formula for CELLFOOD. The trial court dismissed the underlying complaint without prejudice on July 25, 2011.

On August 16, 2011, appellant filed a motion for attorney fees as the prevailing party in the underlying action pursuant to the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) on the ground respondent made the claim in "bad faith." The trial court granted the motion awarding appellant $39,593.87 in attorney fees. On November 2, 2012, Division Four of this Appellate District reversed the trial court order awarding fees and costs on the ground the evidence did not establish respondent made its claims against appellant in bad faith. (*NuScience Corporation v. David McKinney* (Nov. 2, 2012, B237119) [nonpub. opn.].)

***The Malicious Prosecution Complaint***

On October 12, 2011, appellant filed the first amended malicious prosecution complaint, which is the operative pleading in this matter. The first amended complaint alleged that respondent pursued claims against him in the underlying action labeling appellant as the lead defendant and "racketeer." Respondent allegedly pursued the claims based on a series of e-mails. However, despite repeated and comprehensive discovery requests respondent never produced any documents supporting its claims against appellant. Respondent allegedly continued to prosecute baseless claims against appellant without probable cause. Respondent dismissed the underlying complaint "at the precipice of a hearing on a motion for terminating sanctions" after engaging in evasive conduct regarding evidence to support claims against appellant. Appellant alleged that respondent had maliciously prosecuted against him causes of action for trade libel, misappropriation of trade secrets and civil RICO violations.

5

*The Motion to Strike*

On December 12, 2011, respondent filed a special motion to strike the malicious prosecution complaint under section 425.16. The motion was brought on the ground appellant would not be able to prove the elements of a favorable termination, lack of probable cause and malice in fact given the e-mail chain between him and Robert.

Negrete, respondent's president, filed a declaration in support of the motion to strike. The declaration described the company's operations and efforts to maintain confidential information about the manufacture of CELLFOOD and other information such as its customer lists.

Appellant began working for respondent in October 2005 as its vice-president of sales and marketing. At the time he was employed, appellant entered into a written employment agreement in which he agreed to maintain respondent's trade secrets and other confidential and proprietary information. Appellant's position gave him access to respondent's confidential and trade secret information including production technologies, manufacturing procedures and customer information.

The base component of CELLFOOD is made up of a syrupy substance the company calls "the seed." Appellant had access to the source of the seed and the manner in which the seed is acquired. Appellant was also aware of the federal lawsuit between respondent and the Henkels. In the August 2008 written separation agreement, appellant agreed to maintain the confidentiality of certain matters related to respondent as consideration for various benefits.

In June 2010, Negrete received an e-mail chain between appellant and Robert. Negrete explained some references in the e-mail chain as follows. Kim Rhoten is Jerald Rhoten's widow and owner of Deutrel Laboratories and respondent. Jon is Kim's son and president of Deutrel Laboratories. The Henkels refer to Kim as "Ms. Kim," Jon as "Rockstar" and Negrete as "Sharkey."

The first e-mail in the chain, dated January 22, 2010 from Robert to appellant states: "Dave, [¶] Did you receive the samples I sent you? Let me know what you think. [¶] Bob."

6

Appellant's reply to Robert states: "Bob, [¶] I did receive the samples and I have been using them and I have to say I am impressed. . . . [¶] I am definitely interested in seeing where we can go with this that would be profitable for all of us and offset some of the damage that has been done. Have you talked with your brother about our discussions yet? Let's talk next week and see what we can come up with. [¶] Would you be so kind as to send just a small sample of the 'seed' or whatever you call it. I am interested in comparing what I know with what you have. [¶] The other thing I was thinking about was the production issues. [¶] Are you producing the bulk and having it bottled somewhere else, or are you bottling it yourself? What is your capacity for bottling? I have some contacts in Asia that may be interested in several hundred thousand bottles if we can produce them. [¶] It goes without saying perhaps . . . all conversations and e-mails between us are strictly confidential. Whatever we do together will be completely between us. I know how hard certain individuals tried to find out who your customers are and who[m] you may have 'sold' the formulation to. As we get further down the road with one another, we have to have strategy that will insulate either one of our companies from further problems. I have some ideas on how we may be able to do that."

Robert responded to appellant: "Dave, [¶] That's great to hear you like the product. I have spoken with my brother and we are game for any business opportunity. [¶] As far as the 'seed' goes, are you talking about what you said [M]s. [K]im shows up with and gives to [K]evin? . . . [A]s for production, we have been selling it in one gallon jugs and five gallon buckets, bottling it ourselves. [W]e can produce the bulk but it would have to be bottled elsewhere with those kind of numbers."

On January 23, 2010, appellant replied to Robert: "Hey Bob, [¶] Yes I am talking about what Kim is giving to Kevin. . . . I'd just like to compare the two for fun really. . . . [¶] Bulk would be ok, we can get it bottled somewhere else. . . . [W]hat's the prices on one gallon and 5 gallon[s]."

Robert responded: "David, [¶] At this time I am not comfortable sending the 'seed' without a non-disclosure in place, but you are more than welcome to come here and see it all!! . . . ."

7

Appellant answered: "Hey Bob, [¶] I understand your issue with non-disclosure. Not a problem. I am interested in coming out and seeing you. I will talk to my other partner about timing and we may find ourselves on your doorstep. . . . I'll be in touch."

On June 26, Robert forwarded the aforementioned e-mails to a third party named Tom Meyers. The e-mail from Robert to Myers states: "Tom, [¶] [These e-mails are from [appellant] former vice president of [respondent]!!! [T]his proves that [C]ELLFOOD is not [good manufacturing practices] compliant, as the super syrup (the trade secret) is made off site (not at [N]u[S]cience [C]orp.) probably in [K]im [R]hoten's garage!!!"

Thereafter, Myers wrote to cell@nuscience.com, on June 26, 2010: "[I] got you now you liars."

According to Negrete, Myers subsequently contacted some of respondent's customers and informed them that respondent was not in compliance with good manufacturing practice standards. But, Negrete declared there were no standards in place at the time appellant was employed by respondent. After appellant left respondent's employment, respondent became fully compliant by bringing production of the "seed" in house. Respondent became compliant one year before the good manufacturing practice regulations went into effect.

After receiving the e-mail chain, respondent hired the law firm of Jacobson Russell Saltz & Fingerman, LLP to review the evidence and advise respondent of its rights. Respondent provided "all relevant facts" to its attorneys. Based on advice of counsel, respondent determined it had probable cause to pursue and elected to file a complaint against appellant and Robert. Negrete declared: "[Respondent] filed the underlying complaint against [appellant] based on [appellant's] breach of his Separation Agreement, his conversations with Robert Henkel, and in order to prevent further dissemination and misappropriation of [respondent's] trade secrets, and not with any bad faith intentions, personal animosity or maliciousness. It most certainly was not filed to harass or annoy [appellant]."

8

Negrete declared: "Based on credible threats by Robert Henkel, [respondent] made a corporate decision to hold off on the aggressive prosecution of this case until it was determined what could be done with respect to the Henkels' threats, for fear that [appellant] was still in contact with the Henkels and would potentially report the goings-on in this case to the Henkels. [Respondent] determined that the risk of release of the formula was far too great not to comply with Robert's extortionist threats and thus made the decision to dismiss the case on July 25, 2011."

Negrete further declared: "If [respondent's] trade secret formulas were to be released to the public, the formula would be mass produced in countries like China, which is beyond the protection of this Country's intellectual property laws and [respondent] would lose its entire business, which presently generates worldwide retail sales over $230 million solely as a result of the formula being a secret."

Respondent's attorney, Michael J. Saltz, filed a declaration in support of the special motion to strike. He explained that, after reviewing the e-mail chain and subsequent investigation of the underlying fact, he advised respondent that there was more than sufficient probable cause to file the underlying complaint. After the underlying complaint was filed, respondent obtained a default against Robert in March 2011. After the default was entered, Robert and Michael began posting threats on the Internet to publicly disclose respondent's trade secret formulas. Michael telephoned Saltz and threatened to publish the formula for free on the Internet if respondent continued to prosecute the underlying complaint and enforce the federal judgment. Michael followed up on the telephone call by posting a threat on his Web site.

As a result of the threats, respondent contacted the Federal Bureau of Investigation (FBI) in March 2011. Respondent also decided not to aggressively prosecute the case for fear of what the Henkels might do. The FBI told respondent it could not disclose the existence of the investigation at the time because it could tip off the parties involved in the investigation.

On July 19, 2011, Saltz spoke with Robert on the telephone. Robert threatened to release respondent's formula to the world unless respondent dismissed the underlying

9

complaint. After conferring with the FBI and counsel, respondent determined the underlying complaint should be dismissed due to the risk of releasing the formula.

Respondent argued the special motion to strike should be granted because: it had engaged in a protected activity; and appellant could not establish a probability of prevailing in a malicious prosecution cause of action. Respondent asserted appellant would not be able to establish there had been a favorable termination on the merits because respondent dismissed the underlying complaints after codefendant Robert made threats of extortion. Appellant would not be able to establish probable cause given the e-mail chain between appellant and Robert. Respondent relied on advice of counsel. Appellant would not be able to establish malice.

Appellant opposed the special motion to strike by arguing there was a favorable termination because the action was dismissed immediately prior to the hearing on the motion for terminating sanctions. Appellant contended he only had to establish that one of the causes of action in the underlying complaint lacked probable cause. Respondent never produced any evidence to support its theories of trade libel, trade secret misappropriation, or civil RICO violations. Appellant asserted the evidence was insufficient to support the defense of advice of counsel.

In reply, respondent argued appellant failed to produce evidence to support the opposition. Respondent failed to meet its burden to show it would prevail on any of the malicious prosecution elements.

The trial court granted the special motion to strike. In granting the motion, the trial court rejected appellant's claim that the dismissal prior to the hearing on the discovery motion was a favorable termination. The trial court stated its conclusion "is supported by undisputed evidence, submitted through the declaration of the attorney who represented [respondent] in the underlying action, that the case was dismissed in response to extortionist threats." The trial court also determined that appellant had not established respondent lacked probable cause to bring the claims for misappropriation of trade secret, trade libel and the RICO claim. With respect to the RICO claim, the trial court concluded that the claim was tenable under title 18 United States Code section 1513(b)(1) as a

10

retaliation claim. The trial court further concluded that the evidence established respondent was entitled to assert the advice of counsel defense. Appellant filed a timely notice of appeal from the order striking the complaint.[2]

The trial court subsequently granted respondent's motion for attorney fees under section 425.16, subdivision (c). In awarding attorney fees, the trial court reduced the requested fee amount by $14,268.75 and granted the request in the amount of $129,388.75 plus costs of $550. On October 17, 2012, the timely appeal from the order awarding attorney fees was consolidated with the appeal from the order granting the special motion to strike.

## DISCUSSION

### I.       Special Motion to Strike Standards

Section 425.16, subdivision (a), states the purpose of the special motion to strike as follows: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the

---

[2]      On May 16, 2013, we denied respondent's motion to dismiss the appeal from the special motion to strike for lack of jurisdiction. However, respondent has raised the issue in its brief asserting that the May 16, 2013 order did not specify if the denial was with or without prejudice.

Respondent's renewed motion is denied under liberal interpretation standards. (Cal. Rules of Court, rule (a)(2); *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 20.) The order granting the special motion to strike was entered on April 4, 2012. Appellant filed a notice of appeal on April 25, 2012 from "An order or judgment under Code of Civil Procedure section 904.1 [subdivision] (a)(3)-(13)." Appellant's Notice Designating Record on Appeal included a request for the March 27, 2012 hearing on the special motion to strike. It is reasonably clear that appellant meant to appeal from the April 4, 2012 order striking his malicious prosecution complaint. It also does not appear that respondent was misled or prejudiced by the April 25, 2012 notice of appeal. Therefore, we construe the notice of appeal to be from the April 4, 2012 order striking the complaint.

11

judicial process. . . ." Such a lawsuit may be dismissed under section 425.16, subdivision (b)(1) which provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Section 425.16 is to be construed broadly so as to protect the constitutional rights of petition and free speech. (§ 425.16, subd. (a); *Kibler v. Nothern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1119–1121.) In deciding whether to grant a special motion to strike, the trial court must consider two components. First, the moving party has the initial burden of establishing a prima facie case that the plaintiff's cause of action arose out of the defendant's actions in the furtherance of the rights of petition or free speech. (§ 425.16, subd. (b)(1); *Flatley v. Mauro* (2006) 39 Cal.4th 299, 314; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, if defendant establishes the first prong, the burden shifts to plaintiff to establish a probability that he or she will prevail on the merits. (§ 425.16, subd. (b)(1); *Flatley*, *supra*, at p. 314; *Rusheen, supra*, at p. 1056.) We use our independent judgment to determine whether the defendants were engaged in a protected activity (*Flatley*, *supra*, at pp. 325–326; *Rusheen*, *supra*, at p. 1055) and whether the plaintiffs met their burden of establishing a probability of prevailing on the claim. (*Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees* (1999) 69 Cal.App.4th 1057, 1064.)

## II.    The Probability of Prevailing

There is no dispute about the first prong of section 425.16, subdivision (b). However, appellant argues the trial court erred in concluding he failed to produce evidence showing a probability of prevailing on his malicious prosecution claim.

Because of the potential chilling effect on a citizen's right to open access to courts for redress of their disputes, malicious prosecution is traditionally regarded as disfavored. (*Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 740; *Sheldon Appel Co. v. Albert & Oliker*

12

(1989) 47 Cal.3d 863, 872.)  The elements of a malicious prosecution cause of action are: (1) commencement of a lawsuit by or at defendant's direction which was terminated in plaintiff's favor; (2) the prior lawsuit was brought without probable cause; (3) the prior lawsuit was initiated with malice; and (4) resulting damages.  (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 216.)

Here, the parties dispute whether appellant could have established each of the elements.  We conclude appellant will not be able to establish either a favorable termination or the lack of probable cause.

### A.    There was no favorable termination on the merits.

The parties disagree as to whether there was a favorable termination on the merits. "[A] voluntary dismissal, even one without prejudice, may be a favorable termination which will support an action for malicious prosecution.  [Citation.]  'In most cases, a voluntary unilateral dismissal is considered a termination in favor of the defendant in the underlying action; the same is true of a dismissal for failure to prosecute.  [Citations.]' [Citation.]"  (*Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808; see also *Robbins v. Blecher* (1997) 52 Cal.App.4th 886, 893.)  However, ""'[t]he theory underlying the requirement of favorable termination is that it tends to indicate the innocence of the accused, and coupled with the other elements of lack of probable cause and malice, establishes the tort [of malicious prosecution]."  [Citations.]  [¶]  It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits.  However, termination must *reflect* on the merits of the underlying action.  [¶]  It is apparent "favorable" termination does not occur merely because a party complained against has prevailed in an underlying action. While the fact he has prevailed is an ingredient of a favorable termination, such termination must further reflect on his innocence of the alleged wrongful conduct.  If the termination does not relate to the merits—reflecting on neither innocence of nor responsibility for the alleged misconduct—the termination is not favorable in the sense it

13

would support a subsequent action for malicious prosecution.' [Citation.]" (*Eells v. Rosenblum* (1995) 36 Cal.App.4th 1848, 1854–1855.)

Appellant asserts that he is entitled to a jury trial as to whether respondent requested the dismissal to avoid a terminating sanction. Respondent counters undisputed evidence established that it dismissed the action as a result of threats by codefendant Robert to release the formula for CELLFOOD on the Internet if respondent continued to prosecute the underlying complaint against appellant. We agree with respondent that the undisputed evidence shows that appellant will not be able to prove the element of favorable termination.

The e-mail chain established that there was some doubt as to whether appellant was innocent of the causes of action raised in the underlying complaint, which are at issue in this appeal: trade libel and the RICO violations. The e-mail chain shows that appellant was communicating with Robert, who competed with respondent. Robert was also enjoined by a federal judgment from utilizing respondent's trade secret and proprietary information. Appellant was a former employee and officer of respondent. In that capacity, appellant obtained trade secret and proprietary information. The e-mail chain shows a discussion between appellant and Robert about "the seed" and plans to form some sort of venture presumably which would compete with respondent. There were also disparaging remarks made about where respondent manufactured "the seed," which was then passed on to third parties. This evidence left more than ample doubt as to whether appellant was innocent of the claims in the underlying complaint. There is no favorable termination and, therefore, no basis for a malicious prosecution claim where resolution of the underlying complaint "leaves some doubt as to the defendant's innocence or liability." (*Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335.) For that reason, we disagree with appellant's claim that a jury needed to decide the motivation for termination.

## B.    Appellant did not establish a lack of probable cause.

The record also shows that appellant cannot establish respondent lacked probable cause to pursue the trade libel and RICO claims. The probable cause element considers

14

whether, in light of the known facts, any reasonable attorney would have believed the claim to be legally tenable. (*Sheldon Appel Co. v. Albert & Oliker*, *supra*, 47 Cal.3d at pp. 885–886; see also *Sangster v. Paetkau* (1998) 68 Cal.App.4th, 151, 164–165 [probable cause does not exist if the facts relied on are not reasonably believed to be true or recovery is sought on an untenable legal theory under known facts].) The issue of whether probable cause existed in filing the underlying complaint is legal. (*Sheldon Appel Co.*, *supra*, at pp. 875, 885–886.) Because a malicious prosecution claim may be based on only one cause of action alleged in the underlying complaint, we examine the individual claims at issue in the appeal: trade libel and RICO. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 57.)

**1.     Respondent had probable cause to sue for trade libel.**

"'Trade libel is defined as an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff. . . . "Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, . . . [T]he plaintiff must prove in all cases that the publication has played a material and substantial part inducing others not to deal with him, and that as a result he has suffered special damages. . . . Usually, . . . the damages claimed have consisted of loss of prospective contracts with the plaintiff's customers."' [Citation.]" (*Nichols v. Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 773.)

The underlying complaint was filed after respondent received an e-mail chain between its former employee/officer (appellant) and a competitor. The competitor was bound by a federal judgment adjudicating respondent's trade secret rights in CELLFOOD. The federal judgment also restrained the competitor from violating respondent's trade secret rights. However, the subject of the e-mails clearly indicated plans between the parties to violate respondent's trade secret rights and the federal judgment.

Moreover, as noted above, the e-mail chain included statements between Robert and appellant about where "the seed" was manufactured. In one e-mail, a statement was

15

made about "the seed" from Robert to appellant as follows: "Dave, [¶] That's great to hear you like the product. I have spoken with my brother and we are game for any business opportunity. [¶] As far as the 'seed' goes, are you talking about what you said [M]s. [K]im shows up with and gives to [K]evin? . . ."

On January 23, 2010, appellant replied to Robert: "Hey Bob, [¶] Yes I am talking about what Kim is giving to Kevin. . . ."

An inference can be made that in some other conversations between appellant and Robert, not in the e-mail chain, appellant made disparaging remarks about respondent's production and manufacturing practices as being off-site and not compliant with good manufacturing practices requirements. In fact, on June 26, 2010, Robert forwarded the aforementioned e-mails to a third party named Meyers. The e-mail from Robert to Myers states: "Tom, [¶] These e-mails are from [appellant] former vice president of [respondent]!!! [T]his proves that [C]ELLFOOD is not [good manufacturing practices] compliant, as the super syrup (the trade secret) is made off site (not at [N]u[S]cience [C]orp.) probably in [K]im [R]hoten's garage!!!"

Myers, then wrote to cell@nuscience.com, on June 26, 2010: "[I] got you now you liars." Negrete's declaration indicated that Myers subsequently contacted some of respondent's customers and informed them that respondent was not in compliance with good manufacturing practice standards. Respondent produced evidence that the statements about the off-site production and the good manufacturing practice were false as respondent was compliant a year before the federal regulations were in place.

In the appeal, appellant claims that respondent would not have been able to show that it suffered pecuniary damages as a result of an act of disparagement by appellant. Appellant contends that respondent did not produce any evidence in its discovery responses which established damages from the statements. And, the trial court allegedly granted the special motion to strike by erroneously presuming damages under defamation as opposed to trade libel standards. The fact that respondent did not produce discovery responses indicating specific damages does not establish the absence of probable cause. We agree with the trial court that, given the evidence that Myers' republished statements

16

made in the e-mail chain to respondent's customers, a reasonable attorney could have presumed damages to its client. The damages would have been subject to proof at trial. Although respondent did not ultimately prove the claim, it does not mean the theory was not legally tenable. To avoid serious chilling effects on the assertion of litigation rights, parties may assert arguably correct issues even when they are "extremely unlikely" to win. (*Sheldon Appel Co. v. Albert & Oliker*, *supra*, 47 Cal.3d at p. 885; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) As a result, plaintiff cannot prevail on the contention respondent lacked probable cause to prosecute the trade libel claim.

### 2. Respondent had probable cause to prosecute the RICO claim.

Appellant also claims respondent lacked probable cause to prosecute the RICO claim. Generally a RICO claim requires proof that "the defendant caused injury to the plaintiff's business or property by engaging in a pattern of racketeering activity in connection with an enterprise which affects interstate commerce." (*Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218, 1232.)

"For an act or omission to qualify as racketeering activity, it must be included in the list of activities set forth in title 18 United States Code section 1961(1). While that list is lengthy, it does not include every criminal or civil wrong a person or entity might commit, and excluded actions, no matter how grievous, cannot qualify as racketeering activity within the meaning of RICO. [Citation.] In addition, a common element of all actions included in the list is a requirement that the action be criminal in nature, that is, that it be chargeable, indictable, or punishable as a crime. However, while the conduct must be criminal, there is no requirement that it have been charged in a criminal proceeding or have been the subject of a prior conviction. [Citation.] [¶] To support a claim under RICO, it is not enough that the defendant engaged in a racketeering activity; rather, the plaintiff must also establish a pattern of racketeering activity. In this respect RICO is vague, stating only that a pattern requires at least two predicate acts of racketeering activity. (18 U.S.C. § 1961(5).) In common parlance two of anything rarely forms a pattern and it appears clear that Congress intended to require a minimum of two acts but not to provide that two acts are necessarily sufficient. [Citation.]" (*Gervase v.*

17

*Superior Court*, *supra*, 31 Cal.App.4th at p. 1232.) *Gervase* noted that the United States Supreme Court had rejected a rigid formula for determining a pattern of racketeering and indicated the determination must be made on a case specific basis. (*Ibid*.) "RICO is concerned with racketeering activity in connection with an enterprise that engages in or affects interstate commerce and it is, again, vague with respect to the 'enterprise' requirement. The definitional portions of RICO do not provide a meaning for the term but simply set forth a broad inclusive list that essentially permits any person, entity or group to be an 'enterprise.' The required enterprise may be either 'legitimate' or 'illegitimate,' that is, it does not matter whether or not the enterprise itself is criminal in nature. [Citation.] And while the concept of an enterprise implies some sort of goal, the goal need not be profit oriented or economic in nature. [Citation.] [¶] RICO does not purport to provide redress for any and all injuries that may be attributed to a violation, rather, it is limited to injury to a person's business or property. (18 U.S.C. § 1964(c).)" (*Id.* at p. 1233.)

Here, the civil RICO claim was predicated on allegations appellant conspired with Robert to violate the federal court judgment. The underlying complaint alleged appellant was part of an enterprise designed to violate the federal judgment which precluded Robert from misappropriating respondent's trade secrets. Appellant's theory is that none of the conduct alleged in the complaint of violating a federal judgment is chargeable, indictable or punishable as a crime.

The trial court concluded and we agree that the underlying complaint sufficiently alleged a retaliation claim under title 18 United States Code section 1513 (§ 1961(1) [listing retaliation against a witness as a racketeering activity]) to support the RICO claim. Title 18 United States Code section 1513(b) provides for a fine or imprisonment for persons who knowingly engage in conduct and cause damage to "the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—[¶] (1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding." The underlying complaint alleged a conspiracy between appellant

18

and Robert to violate the federal judgment. The e-mail chain arguably indicates an intent by appellant to work with Robert to retaliate against respondent for obtaining the federal judgment.

### 3. Respondent relied on advice of counsel.

The trial court also concluded that appellant cannot establish a lack of probable cause because of the advice of counsel defense. "Probable cause may be established by the defendants in a malicious institution proceeding when they prove that they have in good faith consulted a lawyer, have stated all the facts to him, have been advised by the lawyer that they have a good cause of action and have honestly acted upon the advice of the lawyer." (*Lucchesi v. Giannini & Uniack* (1984) 158 Cal.App.3d 777, 788, overruled on a different point in *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 824; see also *DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1397–1398.) The undisputed evidence established that, after receiving the e-mail chain, respondent consulted an attorney. After reviewing the e-mail chain, the federal judgment, and appellant's employment agreement, respondent's attorney advised respondent to file the underlying complaint. Respondent's decision to pursue the underlying complaint was based on counsel's advice. This evidence is sufficient to establish the advice of counsel defense to the malicious prosecution claim.

## III. The Attorney Fee Claim

Appellant asserts that the trial court abused its discretion in awarding attorney fees in the amount of $129, 938.75. The mandatory attorney fee award under section 425.16, subdivision (c) is determined under a lodestar approach. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131.) The lodestar method requires the trial court to first determine a touchstone or lodestar, which is the number of hours reasonably, expended multiplied by a reasonable hourly compensation for each attorney. (*Id.* at p. 1134; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) The trial court may then adjust the lodestar figure upward or downward by taking various "relevant factors" into account. (*Chavez v.*

19

*City of Los Angeles* (2010) 47 Cal.4th 970, 985; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48.)

The trial judge has discretion to determine the value of the attorney services. (*Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1295; *Press* v. *Lucky Stores Inc.* (1983) 34 Cal.3d 311, 324.) "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49.)

We are not convinced the trial court was wrong in awarding the amount of attorney fees in this case. The special motion to strike involved complicated issues concerning the prosecution of and the legal theories to support the underlying complaint. The underlying complaint was based in part on actions taken with regard to an Iowa State judgment and a federal judgment. Attorney fees were requested for time spent: analyzing the malicious prosecution complaint; researching the special motion to strike; preparing the motion; opposing appellant's discovery motion on the motion to strike; and preparing the attorney fee motion. The record shows the trial court reviewed the record and reduced the requested amount by approximately $14,000. Under the circumstances, we cannot conclude the trial court exceeded the bounds of reason in exercising its discretion.

## IV. Respondent's Request for Sanctions

Respondent has requested sanctions against appellant and his counsel pursuant to California Rules of Court, rule 8.276(a) which provides that sanctions may be imposed by an appellate court on a party and an attorney for: "(1) Taking a frivolous appeal or appealing solely to cause delay; [¶] (2) Including in the record any matter not reasonably material to the appeal's determination; [¶] (3) Filing a frivolous motion; or [¶] (4) Committing any other unreasonable violation of these rules."

Respondent claims sanctions are appropriate because appellant and his counsel deliberately misrepresented the record. According to respondent, appellant deliberately misrepresented that the malicious prosecution complaint was not based on the trade secret

20

claim.  The issue arose because respondent asserted in its brief on appeal that appellant had abandoned the claim that the misappropriation of trade secrets was maliciously prosecuted.  In the reply brief, appellant claimed that the malicious prosecution complaint was not based on the trade secret claim.  Respondent also claims that appellant "falsely" stated that respondent submitted no facts in support of its advice of counsel defense.

We do not condone the practices highlighted by respondent in the sanctions motion.  However, our Supreme Court has stated that sanctions should be used "sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 651.)  We cannot conclude that the conduct is this case warrants the imposition of sanctions.  In any event, we have disregarded factual assertions made by appellant which are not supported by the record.  Accordingly, respondent's sanction request is denied.

## DISPOSITION

The orders are affirmed.  NuScience Corporation is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:


_____, P. J.

BOREN


_____, J.

CHAVEZ

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21